IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER M.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| LELAND DUDEK, Acting | : | NO.  23-2239 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                        March  17, 2025

Plaintiff seeks review of the Commissioner's decision denying her application for

supplemental security income ("SSI").  For the reasons that follow, I conclude that the

decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence

and affirm the Commissioner's decision.

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed an application for SSI on November 30, 2020, alleging

disability as a result of post-traumatic stress disorder ("PTSD"), anxiety, visual

perception disorder, sensory processing disorder, audio visual disorder, anemia, low

vitamin D, muscle spasms, vertical heterophia, concussion, and post concussion

---

[1]Consistent with the practice of this court to protect the privacy interests of
plaintiffs in social security cases, I will refer to Plaintiff using her first name and last
initial.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D.
Pa. June 10, 2024).

[2]Leland Dudek was appointed as the Acting Commissioner of Social Security on
February 19, 2025.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure,
Mr. Dudek should be substituted as the defendant in this case.  No further action need be
taken to continue this suit pursuant to section 205(g) of the Social Security Act.  42
U.S.C. § 405(g).

syndrome.  Tr. at 128, 260, 288.[3]  Her application was denied initially, id. at 146-49, and

on reconsideration, id. at 156-57, and she requested an administrative hearing.  Id. at 161-

63.  After holding a hearing on March 30, 2022, id. at 49-80, the ALJ issued an

unfavorable decision July 5, 2022.  Id. at 10-35.  The Appeals Council denied Plaintiff's

request for review on April 27, 2023, id. at 1-3, making the ALJ's July 5, 2022 decision

the final decision of the Commissioner.  20 C.F.R. § 416.1481.  Plaintiff sought review in

the federal court on June 12, 2023, Doc. 1, Doc. 1, and the matter is now fully briefed and

ripe for review.  Docs. 12, 17-18.[4]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion," and must be "more than a mere

---

[3]Although Plaintiff alleges an onset date of August 1, 2017, tr. at 260, she would
not be eligible for SSI benefits until the application date.  See 20 C.F.R. § 416.305 ("you
must file an application to become eligible to receive benefits"); see also tr. at 54
(attorney acknowledging that the filing date is the earliest date Plaintiff can be eligible for
benefits).  Plaintiff filed an earlier application for benefits in 2018, the denial of which
Plaintiff appealed to the Appeals Council, which denied review on November 18, 2020,
id. at 109, and Plaintiff did not seek review in the federal court. The prior decisions from
the ALJ and Appeals Council are included in this record.  Id. at 81-100, 101-07.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 7.

scintilla." <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)); <u>see</u> <u>also</u> <u>Biestek v. Berryhill</u>, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues. <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

> 5.    If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 416.920(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

In her July 5, 2022 decision, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since November 30, 2020, her application date. Tr. at 13.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of disorders of the spine, asthma, post-concussion syndrome, obesity, carpal tunnel syndrome, right trigger thumb, generalized anxiety disorder ("GAD"), major depressive disorder ("MDD"), attention deficit hyperactivity disorder ("ADHD"), and PTSD.  Id.[5] At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 15.

The ALJ determined that Plaintiff retains the RFC to perform light work, but limited to occasional postural activities; no climbing ladders, ropes or scaffolds;

---

[5]The ALJ found other conditions to be non-severe:  diabetes, seasonal allergies, left shoulder pain, gastro-esophageal reflux disease, gastritis, neutrophilia/leukocytosis, urinary frequency, and dysphagia.  Tr. at 13-15.

4

occasional climbing ramps/stairs; no exposure to unprotected heights; avoid temperature extremes; occasional exposure to dust, odors, wetness, gases, fumes, and poorly ventilated areas; frequently reach, handle, finger, but no overhead reaching and lifting; unskilled work limited to jobs involving only simple, routine tasks, making simple decisions, tolerating occasional changes in the workplace; occasional interaction with coworkers and supervisors, and no direct public interaction; alternate from standing to sitting every 60 minutes with a 10 minute change of position, but would be able to remain on task.  Tr. at 18.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could not perform her past relevant work as a receptionist, id. at 32, but could perform the jobs of price marker, mail sorter, and garment sorter.  Id. at 34.  As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at 35.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly (1) evaluate the medical opinion evidence and properly determine Plaintiff's RFC related to her severe post-concussive syndrome and headaches, (2) determine Plaintiff's mental RFC, and (3) consider Plaintiff's subjective complaints.  Docs. 12 & 18.  Defendant responds that the ALJ's decision, including the assessment of Plaintiff's mental RFC, is supported by substantial evidence and that the ALJ properly considered the opinion evidence and Plaintiff's testimony.  Doc. 17.

### B.   Plaintiff's Claimed Limitations and Testimony at the Hearing

Plaintiff was born on September 18, 1980, and thus was 40 years old when she applied for SSI (November 30, 2020), and 41 years old at the time of the ALJ's decision

(July 5, 2022).  <u>Tr.</u> at 51, 60.  She completed eleventh grade and attended business school.  <u>Id.</u> at 289.  She has past relevant work as a receptionist.  <u>Id.</u>

At the administrative hearing, Plaintiff testified that she cannot work because she has arthritis in her back and cannot sit or stand for long periods of time.  <u>Tr.</u> at 58-59.  She explained that she has chronic pain and her leg gets numb and locks up.  <u>Id.</u>  She testified that she cannot "concentrate, multitask, or pretty much function."  <u>Id.</u> at 58.  Plaintiff said that reclining on the sofa is "the only thing that helps my leg from going numb."  <u>Id.</u>  When Plaintiff's leg locks up, she has to lean on something and move around for 10 -to- 15 minutes.  <u>Id.</u> at 60.  Plaintiff described back spasms "a couple times a day" lasting from 2 -to- 10 minutes, and a throbbing or shooting pain in her back.  <u>Id.</u> at 60-61.  Plaintiff also suffers from pain and popping in her left shoulder.  <u>Id.</u> at 61.  She said that trigger point injections ("TPIs") provided temporary relief for a day or two.  <u>Id.</u> at 62.  Plaintiff complained of left hand numbness and testified that carpal tunnel repair "didn't really do anything."  <u>Id.</u> at 63.  On the right hand, Plaintiff has a trigger thumb, reducing the grip in her right (dominant) hand.  <u>Id.</u>

Plaintiff also suffers from headaches, typically in the back of her head.  <u>Tr.</u> at 64-65.  Plaintiff testified that the headaches are related to how tight her neck and body are and that cold weather causes the muscles to tighten.  <u>Id.</u> at 65.  She said that she cannot concentrate.  <u>Id.</u>  Plaintiff also testified that her mental health impairments impede her ability to concentrate, multitask, and socialize.  <u>Tr.</u> at 68.  She explained that she has difficulty focusing on a conversation and her mind wanders.  <u>Id.</u> at 69.

According to Plaintiff, her husband helps her with showering and getting dressed, especially putting on socks and shoes because she cannot grasp. <u>Tr.</u> at 65. Her 14-year-old daughter and husband prepare meals. <u>Id.</u> She said that she can stand for 3 -to- 4 minutes before experiencing numbness and shooting pain in her back and legs which is relieved by moving around or lying down. <u>Id.</u> at 66. Plaintiff said she can sit for 5 -to-10 minutes without reclining before the numbness starts and she develops pain in her hips. <u>Id.</u> at 67.

On questioning by the ALJ, the VE characterized Plaintiff's past relevant work as a receptionist as a semiskilled job, usually performed at the sedentary level, but as Plaintiff performed it, the job was light. <u>Tr.</u> at 71. Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, <u>see</u> <u>supra</u> at 4-5, the VE testified that such an individual could not perform Plaintiff's receptionist job, but could perform the jobs of price marker, mail sorter, and garment sorter. <u>Id.</u> at 71-72. If the individual required two or three additional rest breaks or would be off task up to 15 -to- 20% of the day, the VE testified that such limitations were work preclusive. <u>Id.</u> at 73-74. Finally, if the individual took 10 minutes to change positions from sitting to standing or vice versa and was off-task for that period, the VE testified that such condition would also be work preclusive. <u>Id.</u> at 75.

C.    **Medical Evidence Summary**[6]

Plaintiff developed dizziness, neck pain, and headaches following an automobile accident on August 10, 2017, during which she lost consciousness. See tr. at 1287; see also id. at 2178 (emergency department treatment notes). She was subsequently treated at Good Shepherd Rehabilitation for neck pain, post-concussion syndrome, vertical heterophoria, oculomotor system abnormalities and abnormal eye movement, light sensitivity, headache, and lightheadedness. Id. at 493-94; see generally id. at 477-85 (referral orders by Kyle Klitsch, D.O.).

During the relevant period, Plaintiff's primary care provider was Village Lane Primary Care. On December 8, 2020, Yasir Abunamous, M.D., noted that Plaintiff's diabetes was stable, ordered bloodwork to check her anemia and Vitamin D deficiency, and noted that Plaintiff had a change in appetite after starting Strattera[7] for ADHD. Tr. at 1145-46. On February 25, 2021, Plaintiff was seen with complaints of left shoulder pain which began with her car accident. Id. at 1264. Physicians' Assistant ("PA") Rachel Guerrera noted that Plaintiff had been receiving regular TPIs, was scheduled for neck and shoulder TPIs on March 2, and prescribed lidoderm patches in the interim.[8] Id. at 1264,

---

[6]The medical evidence in this record spans over 5,000 pages (tr. at 381-5399), with multiple duplications of treatment notes. I will focus my recitation of the medical evidence to that which is relevant to Plaintiff's claims.

[7] Strattera is a treatment for ADHD to help improve attention and reduce hyperactivity and impulsiveness, which works by increasing levels of norepinephrine. See https://www.drugs.com/strattera.html (last visited Feb. 21, 2025).

[8]Lidoderm is a local anesthetic which works by blocking nerve signals in the body. See https://www.drugs.com/lidoderm.html (last visited Feb. 21, 2025).

1269.  On March 16, 2021, Plaintiff followed up after an emergency room visit for frequent urination and flank pain.  Id. at 1204.  A CT scan of the abdomen was normal. Id.  During the visit, Radhika Chandramouli, M.D., noted that Plaintiff's headaches were asymptomatic with TPIs.  Id. at 1206.

On May 11, 2021, Dr. Chandramouli completed a "Multiple Impairment Questionnaire," noting diagnoses of diabetes, mild persistent asthma, carpal tunnel syndrome, anemia, ADD, PTSD, anxiety, myalgia, and chronic sinusitis.  Tr. at 3151. The doctor concluded that Plaintiff could perform a job in a seated position for "6+" hours in an 8-hour workday and perform a standing or walking job for 1 hour.  Id. at 3153.  In addition, the doctor noted that Plaintiff should get up from a seated position every 2 -to- 3 hours for 30 minutes, and could occasionally lift/carry up to 10 pounds.  Id. The doctor opined that Plaintiff would be required to take unscheduled breaks every 2 - to- 4 hours for 30 minutes, and would be absent from work 2 -to- 3 times a month.  Id. at 3154-55.

During the relevant period, Plaintiff was treated for post concussion headaches and chronic neck pain resulting from the accident, which treatment began prior to the relevant period.  See tr. at 1287 (recountng treatment history).  Plaintiff treated with neurologist Jonathan Cheponis, M.D., beginning on February 12, 2019.  See id.  At a follow up at Dr. Cheponis's office on July 7, 2020, PA Carly D. Swiatek noted that Plaintiff had several rounds of TPIs that were "helpful at reducing the neck and shoulder pain" and provided more neck mobility.  Id. at 1286, 1497.  At that time, Plaintiff's migraines were occurring 2 or 3 days per month and Plaintiff took extra strength Tylenol, which was mildly helpful

at reducing the headaches. Id. PA Swiatek noted that Plaintiff's post-concussive symptoms were improving slowly, with great improvement in her visual symptoms. Id. at 1289. However, Plaintiff continued to complain of neck and shoulder pain related to cervical muscle spasm, for which PA Swiatek would arrange for additional TPIs every three months. Id.

When Dr. Cheponis performed the TPIs and occipital nerve blocks ("ONBs") on July 23, 2020, he noted neck pain and stiffness before the procedure and that Plaintiff was "markedly better" after the injections. Id. at 1292-93, 1486.[9] Plaintiff again returned on January 7, 2021, for ONBs and TPIs, and Dr. Cheponis noted marked improvement. Id. at 1295-96. On March 2, 2021, PA Swiatek noted Plaintiff's reports of more frequent headaches, an increase in left shoulder pain, and several months of sinus congestion and symptoms. Id. at 1298. Plaintiff continued to receive TPIs, id. at 3812-13 (3/2/21), 3818 (6/15/21), 3824 (7/28/21), 5249 (9/9/21), 5311 (10/27/21), and the treatment records indicate that Plaintiff reported that the TPIs "typically afford[ed] her 6 months to 1 year of relief," although the injections she received on July 28, 2021, "started to wear off" by early September. Id. at 3824. After the September 9, 2021 injections, PA Swiatek noted that Plaintiff was "markedly better" after the injections and prior to leaving the office. Id. at 5249. In October 2021, PA Krista Remmel indicated that Plaintiff's "neck pain and headaches are well controlled after TPIs for about 1-2 months." Id. at 5311.

---

[9]Plaintiff called on September 16, 2020, indicating that "her neck does not feel that bad at this time," and postponed the injection scheduled the following day to the end of October. Tr. at 4379.

On May 10, 2021, Dr. Cheponis completed a "Multiple Impairment Questionnaire," noting diagnoses of cervical paraspinal muscle spasm, chronic neck pain, and post-concussion syndrome.  Tr. at 3082.  Dr. Cheponis indicated that it was not necessary for Plaintiff to avoid continuous sitting in an 8-hour workday and that Plaintiff would occasionally experience pain, fatigue, or other symptoms interfering with her concentration.  Id. at 3084-85.  He also found that Plaintiff would have to take unscheduled breaks for a few hours 1 -to- 2 times per week, and that Plaintiff would be absent more than three times a month.  Id. at 3085-86.[10]

In addition to injections, Plaintiff sought chiropractic treatment for her neck and lower back pain.  On December 28, 2020, Kurt E. Brzezinski, D.C., noted limitations in range of motion in Plaintiff's lumbar and cervical spine, with spasm and tenderness in both areas.  Tr. at 1445-49.  Dr. Brzezinski planned to treat her twice a week for three weeks and reassess.  Id. at 1449.  Subsequent chiropractic treatment notes indicate that Plaintiff's neck and lower back pain subsided with chiropractic treatment.  See id. at 1431 (12/30/20), 1427 (1/5/21), 1422 (1/12/21), 1418 (1/14/21), 1411 (1/20/21).

Plaintiff returned for chiropractic care on August 4, 2021, complaining about severe right-sided lower back pain and neck pain beginning the month prior.  Tr. at 4221.  On examination, plaintiff had reduced range of motion and spasm in the lumbar and cervical spine.  Id. at 4225.  Dr. Brzezinski planned treatment twice a week for three weeks.  Id. at 4227; see also 4207-08 (8/13/21), 4206 (8/16/21), 4204 (8/18/21).

---

[10]Dr. Cherponis did not complete the portions of the form addressed to a patient's ability to stand, walk, lift, or carry.  Tr. at 3084.

Plaintiff saw physiatrist Phuong Le, D.O., on July 28, 2021, with complaints of right lower back pain and numbness in her left leg. Tr. at 4208-09, 4235. Dr. Le noted a positive straight-leg raising test ("SLR") on the right,[11] decreased range of motion in the lower back, and tenderness to palpation on the left sacroiliac ("SI") joint. Id. at 4213, 4239. Dr. Le reviewed a lumbar MRI from December 6, 2019 showing a disc bulge at L3-4 and L4-5 with foraminal narrowing at L4-5. Id. at 4213, 4240. Dr. Le diagnosed right SI joint pain and left lumbar radiculopathy and recommended right SI joint injections, id. at 4213-14, which the doctor performed on August 9, 2021. Id. at 4214-15.

Plaintiff also suffers from left carpal tunnel syndrome and a right trigger thumb. Tr. at 4414, 4419. In June 2020, prior to the relevant period, Plaintiff underwent carpal tunnel release surgery, see id. at 1513, 4421-22, and injections for her thumb. Id. at 4420; see also id. at 727, 1435, 4344 (12/29/20 injection of trigger thumb by rheumatologist Thomas Quinn, D.O.). On September 20, 2021, Plaintiff underwent a right trigger thumb release. See id. at 4967. On November 17, 2021, Paul A. Sibley, D.O., of LVPG Orthopedics and Sports Medicine, noted that Plaintiff had "[j]ust about full flexion and extension of each digit," but she had some hypersensitivity with a thicker than average scar. Id. Dr. Sibley performed an injection to address Plaintiff's complaints of locking and pain after the surgery. Id. at 4972.

---

[11]In the SLR test, the patient lies supine and the symptomatic leg is lifted with the knee fully extended, and is positive for lumbar radiculopathy if pain is produced between 30 and 90 degrees of elevation, with the distribution of the pain indicative of the nerve root involved. Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 1900.

On May 13, 2022, Marielle Stone, M.D., conducted a consultative Internal Medicine Examination, noting that Plaintiff's gait was normal, squat was 25% of full, SLR was negative, and there was mild tenderness to palpation over the entire spine. Tr. at 5382-86. The doctor found strength was 5/5 in upper and lower extremities and grip strength was 100%. Id. at 5385. Dr. Stone found that Plaintiff could lift and carry up to 20 pounds occasionally, sit for 6 hours in 90 minute intervals, stand or walk for 3 hours each (standing for 30 minute intervals and walking for 15 minute intervals), and should never reach overhead. Id. at 5388-89. In addition, the doctor noted significant environmental limitations. Id. at 5391.

On April 27, 2021, at the initial consideration stage, Phillip Matar, M.D., found from his review of the record that Plaintiff could frequently lift and carry 25 pounds, stand and/or walk for 6 hours and sit for 6 hours in an 8-hour workday. Tr. at 119-21. On October 12, 2021, on reconsideration, Gene Whang, M.D., found that Plaintiff could frequently lift and carry 10 pounds, stand and/or walk for 6 hours and sit for 6 hours in an 8-hour workday, and should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, and hazards. Id. at 136-37.

With respect to mental health impairments, Plaintiff treated with Holcomb Behavioral Health for PTSD, GAD, MDD, and ADHD, prior to and during the relevant period. Tr. at 5126-27. On December 29, 2020, Scott Berman, M.D., noted that Strattera was helping Plaintiff's concentration, but her anxiety had increased due to pain and home

stressors, which the doctor addressed by adding Lexapro.[12]  Id. at 5087-89.  On January

26, 2021, Dr. Berman noted that Plaintiff was "more relaxed and less irritable on this

comb[ination] of Lexapro/Strattera and her attention span is reasonably good.  Better able

to handle daily stress."  Id. at 5090.  On April 21, 2021, Plaintiff reported "decreasing

anxiety especially when driving, less anger, overall feeling better, no depression.

Strattera is helping ADHD and she is handling her tasks better."  Id. at 5093.  On June 15,

2021, the doctor noted that hydroxyzine[13] is helping with Plaintiff's sleep.  Id. at 5096.

In August, the doctor noted that Plaintiff was having conflict and stress at home, but her

mood and sleep were fair and she had good energy and markedly improved

concentration.  Id. at 5099-100.  Plaintiff experienced increased depression, anxiety and

anger in November 2021, caused by financial stress, pain, and lack of sleep.  Id. at 5106.

The doctor added trazodone[14] for insomnia.  Id. at 5107.  On December 29, 2021, Dr.

Berman noted that Plaintiff's sleep was improved on trazodone, but she remained

depressed with the stress of moving and medical problems.  Id at 5114.  On January 25,

2022, the doctor noted Plaintiff had a good response to Lexapro and trazodone for

depression and anxiety, and Strattera for ADHD.  Id. at 5118.  Plaintiff was discharged

---

[12]Lexapro is an antidepressant used to treat certain types of depression and anxiety.  See https://www.drugs.com/lexapro.html (last visited Feb. 21, 2025).

[13]Hydroxyzine is an antihistamine that also reduces activity in the central nervous system, so it can be used as a sedative to treat anxiety and tension.  See https://www.drugs.com/hydroxyzine.html (last visited Feb. 21, 2025).

[14]Trazodone is an antidepressant used to treat MDD, which decreases anxiety and insomnia related to depression.  See https://www.drugs.com/trazodone.html (last visited Feb. 21, 2025).

from Holcomb on March 14, 2022, due to non-compliance, with the notation that Plaintiff

no longer wanted services.  Id. at 5125.

Amanda Kochan-Dewey, Psy.D., conducted a Mental Status Evaluation on June 3,

2021.  Tr. at 3179-83.  The doctor diagnosed unspecified anxiety disorder and ADHD.

Id. at 3182.  On examination, the doctor found Plaintiff's attention and concentration

were mildly impaired with errors in the serial sevens, and that her memory skills were

intact.  Id. at 3181.  The doctor found that Plaintiff had no limitations in understanding,

remembering, or carrying out simple instructions or making simple work-related

decisions; mild limitation in the ability to understand and remember complex

instructions; and moderate limitation in the abilities to carry out complex instructions and

make complex-work related decisions.  Id. at 3184.  With respect to interaction, the

doctor found Plaintiff had moderate limitation in the abilities to interact with the public,

supervisors, and coworkers, and respond appropriately to changes in a routine work

setting.  Id. at 3185.  The doctor also opined that Plaintiff could manage her own funds.

Id. at 3182.

On June 9, 2021, at the initial consideration stage, Karen Louise Plowman, Psy.D.,

found from her review of the record that Plaintiff had mild limitation in her abilities to

understand, remember, or apply information, and interact with others; and moderate

limitation in the abilities to concentrate, persist, or maintain pace, and adapt or manage

oneself.  Tr. at 116.  The doctor found that Plaintiff's ability to carry out very short and

simple instructions was not significantly limited and her abilities to carry out detailed

instructions or maintain concentration for extended periods was moderately limited.  Id.

at 122.  The doctor also found Plaintiff had no social interaction limitations.  Id. at 123.

On reconsideration, Dr. Plowman reached a different opinion on two points, finding that

Plaintiff had no limitation in interacting with others and mild limitation in the ability to

adapt or manage oneself.  Id. at 134, 138.[15]

    **D.**    **Plaintiff's Claims**

        1.    Consideration of Opinion Evidence and Limitations Imposed by
                Severe Headaches

Plaintiff argues that the ALJ failed to properly evaluate the opinions of Drs.

Cheponis and Chandramouli and failed to properly consider the limitations imposed by

her headaches in determining the RFC.  Doc. 12 at 3-9; Doc. 18 at 1-2.  Defendant

responds that the ALJ properly considered the opinions of the doctors and maintains that

substantial evidence supports the ALJ's RFC assessment.  Doc. 17 at 5-13.

The ALJ's consideration of medical opinion evidence is governed by regulations

which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

---

[15]In reciting Dr. Plowman's opinions on reconsideration, the ALJ erred in stating
that the doctor found mild limitation in her interaction abilities and moderate limitation in
the ability to adapt or manage oneself.  Id. at 28.

20 C.F.R. § 416.920c(a).[16]  The regulations list the factors to be utilized in considering

medical opinions:  supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

factor including familiarity with other evidence in the record or an understanding of the

disability program.  Id. § 416.920c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

factors, but do not require discussion of the others.  Id. § 416.920c(b)(2).  The regulations

explain that "[t]he more relevant the objective medical evidence and supporting

explanations presented by a medical source are to support his or her medical opinion(s) . .

. , the more persuasive the medical opinions . . .  will be."  Id. § 416.920c(c)(1).  In

addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other

medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s)

. . . will be."  Id. § 416.920c(c)(2).

The change in the regulations did not change the basic rule that "[t]he ALJ must

consider all the evidence and give some reason for discounting the evidence she rejects."

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714

F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may

choose which evidence to credit and which evidence not to credit, so long as she does not

"reject evidence for no reason or the wrong reason."  Rutherford v. Barnhart, 399 F.3d

---

[16]In contrast, the regulations governing applications filed prior to March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 416.927.

546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala,

994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, Plaintiff complains that the ALJ failed to properly consider the opinions

from Drs. Cheponis and Chandramouli regarding Plaintiff's attention and concentration

and absences from work because "there was no meaningful discussion of the

supportability and consistency of the opinions from Drs. Cheponis and Chandramouli."

Doc. 12 at 6.  Defendant responds that the ALJ properly analyzed the supportability and

consistency aspects of both of these opinions.  Doc. 17 at 6-7-12.

After reviewing Dr. Cheponis's May 2021 opinions, see supra at 11, the ALJ

reasoned as follows:

> This opinion is not persuasive; it is not a function-by-function
> analysis of [Plaintiff's] abilities.  The opinions that her
> symptoms would occasionally interfere with attention and
> concentration and she would need unscheduled breaks 1-2
> times per week needing a few hours o[f] rest before returning
> to work and be absent likely more than three times per month
> are not supported by his treatment of [Plaintiff] which was
> routine and conservative and reflected she had improvement
> in her headaches and spine disorders with injection therapy.
> Further, her mental health treatment indicates she had great
> improvement in her concentration and sleep with medication.
> Further [Plaintiff's] reduced shoulder range of motion on
> examinations is consistent with a finding [Plaintiff] could not
> perform overhead reaching or lifting.

Tr. at 31.

After listing the limitations contained in Dr. Chandramouli's Multiple Impairment

Questionnaire, see supra at 9, the ALJ discussed the opinion.

> This opinion is somewhat persuasive; while it is consistent
> with a restriction to sedentary work based on the lifting

limitations, the longitudinal evidence is more consistent with a restriction to light exertion work, allowing for a sit/stand option as [Plaintiff] maintained 5/5 strength, intact sensation and walked with a normal gait. A restriction to frequent use of hands and fingers is consistent with her progress following surgical interventions. Her restriction to occasionally grasp, turn and twist objects bilaterally and use arms for reaching including overhead is not supported by her treatment of [Plaintiff]. On one end, the [opinion] reflects intact hand and [f]inger dexterity and full grip strength, not requiring a restriction on grasping; however, on the other end, [Plaintiff] has exhibited decreased shoulder range of motion which is consistent with no overhead reaching and lifting. The opinions that her symptoms would frequently interfere with attention and concentration and she would need unscheduled breaks every 2-4 fours for 30 minutes and be absent likely two to three times per month are not supported by her treatment of [Plaintiff] which was routine and conservative. Further, her mental health treatment indicates she had great improvement in her concentration with medication, in her sleep, and that she had improvement in her headaches and spine disorders with injection therapy.

Tr. at 31-32.

Contrary to Plaintiff's complaint, the ALJ addressed supportability and consistency in addressing each of these opinions. The ALJ found that the concentration limitations and frequent absences were not supported by the doctors' own treatment records which included routine and conservative treatment, and, in the case of Dr. Cheponis, were not supported by notes from his office indicating that Plaintiff had improvement in her pain with injection therapy. Tr. at 31-32.[17] These findings are supported by the record.

_____

[17]I note that the ALJ rejected these doctors' findings regarding Plaintiff's ability to reach overhead (Dr. Cheponis – no limitation in reaching), (Dr. Chandramouli - able to occasionally reach), finding, based on her review of the record, that Plaintiff was limited

First, the ALJ's characterization of Plaintiff's chiropractic care and injection therapy as routine and conservative treatment is consistent with caselaw in this circuit. See John C. v. Kijakazi, Civ. No. 20-20442, 2023 WL 4446954, at *11 (D.N.J. July 11, 2023) (collecting cases); Mancini v. Kijakazi, Civ. No. 20-874, 2021 WL 5909817, at *3 n.2 (W.D. Pa. Dec. 14, 2021) (TPIs, chiropractic care, physical therapy, a TENS unit, medication, and a cervical medial branch block characterized as conservative treatment for cervical spine impairment). Moreover, Dr. Cheponis's treatment notes establish improvement in Plaintiff's headaches and neck pain with injections. For example, on July 28, 2021, NP Susan Newhart indicated that the injections "typically afford [Plaintiff] 6 months to 1 year of relief." Id. at 3824. On September 9, 2021, PA Swiatek noted that Plaintiff was "markedly better" after the injections. Id. at 5249. Even when Plaintiff required more frequent injections, PA Remmel indicated that Plaintiff's "neck pain and headaches are well controlled after TPIs for about 1-2 months," and noted that Plaintiff had cancelled her last scheduled injections "because she was doing so well." Id. at 5311.[18] Although Plaintiff argues that it was improper for the ALJ to rely on findings of "a modest and temporary reduction in symptoms," Doc. 12 at 8, the evidence is that

---

to no overhead reaching or lifting. Tr. at 18, 31. The ALJ found that the evidence regarding the limitation in Plaintiff's shoulder range of motion was inconsistent with these opinions. Id. at 31.

[18]Plaintiff argues that because migraine headaches cannot be documented by objective medical tests, Dr. Cheponis's opinion was controlling and the ALJ should have ordered a neurologic consult if she did not believe Dr. Cheponis's opinion was inadequate. Doc. 12 at 7-8. Contrary to this argument, the regulations do not allow the ALJ to defer to any medical opinion. 20 C.F.R. § 416.920c(a). Moreover, PA Remmel's treatment notes establish the efficacy of the injections. See, e.g., tr. at 5311 ("neck pain and headaches are well controlled after TPIs for about 1-2 months").

Plaintiff was "markedly better" after the injections and that they provided relief for a substantial period of time.

As for consistency, the ALJ explained that the limitations each of these doctors imposed on Plaintiff's concentration were inconsistent with the mental health treatment notes in the record. Tr. at 31-32. In September 2020, just prior to the relevant period, Dr. Berman, Plaintiff's treating psychiatrist at Holcomb, noted that Plaintiff had a "robust response to Strattera with improved concentration, less irritability, and lower anxiety." Id. at 5081. Moreover, Dr. Berman's notes indicate improved concentration throughout his treatment of Plaintiff. See id. at 5087 (12/29/20 - "Strattera is helping her concentration"), 5090 (1/26/21 – attention span is reasonably good), 5093 (4/21/21 – "Strattera is helping ADHD and she is handling her tasks better"), 5096 (6/15/21 – Strattera helps her attention), 5099 (8/10/21 – "concentration markedly improved on Strattera").

Plaintiff also complains that the ALJ relied on the opinion of Dr. Whang, a gynecologist and non-examining state agency medical consultant who did not have the benefit of Plaintiff's neurology treatment records. Doc. 12 at 9. Defendant responds that the ALJ properly considered the opinion evidence, utilizing the current regulations which focus on the supportability and consistency of the opinions. Doc. 17 at 12.

After reviewing the record on reconsideration, Dr. Whang concluded that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds, stand and/or walk for 6 hours and sit for 6 hours in an 8-hour workday. Tr. at 136. In addition, Dr. Whang found that Plaintiff could never climb ladders, ropes, or scaffolds and could

occasionally perform all other postural activities.  Id.  The ALJ found Dr. Whang's

opinion persuasive, but acknowledged and addressed the significance of the evidence that

was not available for the doctor's review.

> This opin[ion] is persuasive; it is supported by the records
> available for review at the time opined . . . .  The later-
> acquired evidence as well is consistent with a finding that
> based on her spine disorders and the effects of obesity on her
> joints, she should be restricted to light exertion work with the
> additional postural limitations and that her asthma and post-
> concussive symptoms warrant environmental limitations.
> Nevertheless, in order to accommodate [Plaintiff's] reported
> pain with prolonged sitting and standing, she has been further
> accommodated with the ability to alternate positions.  In
> addition, [Plaintiff's] spine disorders, along with her
> continued problems with her hands due to carpal tunnel
> syndrome and right trigger thumb are consistent with a
> restriction to a reduced range of light exertion work with the
> ability to alternate positions, perform no overhead reaching
> and lifting and no more than frequent reaching in other
> directions, handling and fingering.

Tr. at 29.

As previously discussed, the governing regulations prohibit the ALJ from

deferring or giving any evidentiary weight to any medical opinions.  20 C.F.R.

§ 416.920c(a).  Instead, the ALJ is required to evaluate all the medical opinions focusing

on supportability and consistency.  Id.  Here, the ALJ did exactly what the regulations

required.  After a robust discussion of the medical and mental health treatment evidence,

see tr. at 20-27, the ALJ evaluated each of the opinions and explained how persuasive she

found each.  Plaintiff's complaint that the ALJ erred by finding the non-examining state

agency medical consultant's opinion more persuasive than her treating specialist ignores

the direction of the governing regulations and the ALJ's discussion of the treatment evidence.[19]

In sum, I find no error in the ALJ's consideration of the opinions offered by Drs. Cheponis and Chandramouli. In determining that the opinions both overstated and understated Plaintiff's limitations, the ALJ relied on the doctors' treatment records and other evidence in the record to support her decision.

2.    Mental RFC Assessment

Plaintiff claims that the ALJ failed to properly determine Plaintiff's mental RFC. Doc. 12 at 9-12; Doc. 18 at 2-3. Defendant responds that substantial evidence supports the ALJ's mental RFC assessment. Doc. 17 at 13-16. As previously noted, the ALJ limited Plaintiff to unskilled jobs involving simple, routine tasks, simple decisions, occasional changes in the workplace, occasional interaction with coworkers and supervisors, and no direct public interaction. Tr. at 18.

Dr. Plowman reviewed the mental health treatment record at both the initial and reconsideration levels. Tr. at 117 (initial), 135 (reconsideration). In her assessment following review at the reconsideration level, Dr. Plowman found that Plaintiff had no limitation in her abilities to interact with others; mild limitation in the abilities to understand, remember, or apply information, and adapt or manage oneself; and moderate limitation in the abilities to concentrate, persist, or maintain pace. Id. at 134. With

---

[19]I also note that the cases that Plaintiff cites for this proposition, Dorf v. Bowen, 794 F.2d 896, 901-02 (3d Cir. 1986), and Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986), predate the revision to the governing regulations, which no longer focus on evidentiary weight nor allow deference to any medical opinion. See 20 C.F.R. § 416.920c(a).

respect to sustained concentration and persistence limitations, Dr. Plowman found

Plaintiff was not significantly limited in the abilities to carry out very short and simple

instructions, sustain an ordinary routine without special supervision, work in coordination

or proximity to others, and make simple work-related decision; moderately limited in the

abilities to carry out detailed instructions, maintain attention and concentration for

extended periods and complete a normal workday and workweek without interruptions

from psychologically based symptoms, and perform at a consistent pace without an

unreasonable number and length of rest periods.  Id. at 138.  The doctor also found

Plaintiff had no social interaction or adaptation limitations.  Id.  In the narrative portion

of Dr. Plowman's mental RFC assessment, she stated that "[Plaintiff] is able to meet the

mental demands for simple, one to two step tasks on a sustained basis despite the

limitations associated with her impairments."  Id. at 139.

 After reviewing the limitations contained in Dr. Plowman's October 2021

reconsideration opinion, the ALJ found the opinion somewhat persuasive.

> This opinion is somewhat persuasive; it is generally
> supported by the records available for review at the time
> opined.  The later-acquired evidence in the record, including
> [Plaintiff's] therapy and medication management progress
> notes along with her subjective [complaints] are consistent
> with greater restrictions in her ability to interact with others
> based on her PTSD and anxiety.  As such she has been
> restricted to work involving no public interaction and only
> occasional interaction with . . . coworkers and supervisors.

Tr. at 29.

 Plaintiff argues that "the ALJ . . .  suggested that she found [Plaintiff] more limited

than Dr. Plowman yet failed to even accept all the limitations described by this

psychologist." Doc. 12 at 10. Specifically, seizing upon the language in Dr. Plowman's narrative assessments, Plaintiff argues that the ALJ erred by failing to limit Plaintiff to simple, one to two step tasks. Doc. 12 at 10 (quoting tr. at 124, 139). Defendant responds that the ALJ was not required to include a limitation to one-to-two step tasks and Plaintiff's argument is based on selective quoting of the ALJ's decision. Doc. 17 at 14.

I find no error in the ALJ's mental RFC determination. "[N]o rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gave the source's opinion as a whole 'significant weight.'" Wilkinson v. Comm'r of Soc. Sec., 558 F. App'x 254, 256 (3d Cir. 2014); see also Russell William T. v. O'Malley, Civ. No. 23-2446, 2024 WL 4906490, at *9 (E.D. Pa. Nov. 27, 2024). Here, the ALJ found Dr. Plowman's opinion on reconsideration "somewhat persuasive," evidencing some disagreement with the findings. Tr. at 29. Moreover, in her RFC assessment, Dr. Plowman found that Plaintiff was not significantly limited in the abilities to carry out very short and simple instructions, which the ALJ incorporated by limiting Plaintiff to unskilled work, jobs involving only simple, routine tasks, making simple decisions. Id. at 18, 71-72 (hypothetical), 138 (Dr. Plowman's mental RFC assessment). It was not incumbent upon the ALJ to mirror the language that Dr. Plowman utilized in the narrative portion of her opinion.

Moreover, substantial evidence supports the conclusion that the ALJ's limitation is sufficient to address Plaintiff's concentration limitations. Read as a whole, see Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), the ALJ adequately reviewed the evidence,

including Dr. Berman's notes indicating Plaintiff had a "robust" response to Strattera with improved concentration and less irritability, and Dr. Kochan-Dewey's finding that Plaintiff's attention and concentration were only mildly impaired. Tr. at 25; see also id. at 3181, 5118.

Plaintiff's complaint that the ALJ's decision is somehow misleading because the ALJ stated that she found Plaintiff more limited than Dr. Plowman but did not limit Plaintiff to one-to-two step tasks is disingenuous. The ALJ found that the more recent treatment notes and Plaintiff's subjective complaints required greater restriction "in the ability to interact with others." Tr. at 29. In this regard, the ALJ parted ways with Dr. Plowman's mental RFC assessment in which the doctor found Plaintiff had no social interaction limitations. Id. at 138. Instead, based on the record and Plaintiff's subjective complaints, the ALJ found Plaintiff was limited to occasional interaction with coworkers and supervisors and could have no direct public interaction. Id. at 18. I find that the ALJ's determination of Plaintiff's mental RFC is supported by substantial evidence.

### 3.    Subjective Statements

Plaintiff complains that the ALJ failed to properly evaluate her subjective statements regarding her headaches and mental impairments. Doc. 12 at 12-16. Defendant responds that substantial evidence supports the ALJ's assessment of Plaintiff's subjective complaints. Doc. 17 at 16-18.

Social Security regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and

(2) an evaluation of the intensity and persistence of the pain or symptoms and the extent to which they affect the individual's ability to work.  20 C.F.R. § 416.929(b) & (c); Social Security Ruling ("SSR") 16-3p, Titles II and XVI:  Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *3-4 (Mar. 16, 2016).  Third Circuit case law does not require an ALJ to accept a plaintiff's complaints concerning her symptoms, but rather requires that they be considered.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011).  An ALJ may disregard subjective complaints when contrary evidence exists in the record, see Mason, 994 F.2d at 1067-68; see also Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence.").  SSR 16-3p requires the ALJ to consider all the evidence in determining the intensity, persistence, and limiting effects of the claimant's symptoms.  2016 WL 1119029, at *4-7.  In addition to the medical evidence, SSR 16-3 p requires the ALJ to consider the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of medication the claimant uses to alleviate the symptoms; treatment, other than medication, the claimant has received; other measures the claimant has used to alleviate the symptoms; and any other factors.  Id. at *7; see also 20 C.F.R. § 416.929(c)(3) (listing same factors).

As previously discussed, at the administrative hearing Plaintiff testified that pain in her back prohibits long-term sitting or standing.  Tr. at 58-59.  According to her testimony, Plaintiff can stand for only about 3 or 4 minutes and sit for 5 to 10 minutes.

Id. at 66-67. She also said that she cannot "concentrate, multitask, or pretty much function." Id. at 58. With respect to her neck and shoulder pain, Plaintiff said that the TPIs provided temporary relief for a day or two. Id. at 62. Plaintiff also complained about her hands locking up causing her to drop things and requiring her husband to help her dress because she cannot grip things like socks and shoes. Id. at 63-65.

The ALJ found that Plaintiff's "statements about the intensity, persistence, and limiting effects of . . . her symptoms . . . are inconsistent because the evidence in the record does not support the severity of the symptoms alleged." Tr. at 20. After reviewing the treatment evidence, including aggravating factors and the types and efficacy of treatments, the ALJ explained how the RFC assessment accommodated Plaintiff's limitations that were supported by the treatment record and Plaintiff's activities, and included a sit/stand option to address Plaintiff's complaints of pain with prolonged sitting and standing. Id. at 27. With respect to Plaintiff's mental health impairments, headaches, and spine disorders, the ALJ concluded that Plaintiff "had great improvement in her concentration with medication, in her sleep, and . . . she had improvement in her headaches and spine disorders with injection therapy." Id. at 32.

These conclusions are supported by substantial evidence. As previously discussed, Dr. Cheponis's records reflect that the TPI's provided long-term relief from her headaches and neck pain. See tr. at 3824 (7/28/21 – typically 6 months to 1 year of relief), 5311 (10/27/21 – "neck pain and headaches are well controlled after TPIs for about 1-2 months"). Dr. Berman noted that Plaintiff had a "robust" response to Strattera with improved concentration, less irritability, and lower anxiety," id. at 5081, and his

notes indicate improved concentration throughout his treatment of Plaintiff.  See id. at

5087 (12/29/20 - "Strattera is helping her concentration"), 5090 (1/26/21 – attention span

is reasonably good), 5093 (4/21/21 – "Strattera is helping ADHD and she is handling her

tasks better"), 5096 (6/15/21 – Strattera helps her attention), 5099 (8/10/21 –

"concentration markedly improved on Strattera").  Moreover, both Drs. Cheponis and

Chandramouli found that it was not medically necessary for Plaintiff to avoid continuous

sitting in an 8-hour workday.  Id. at 3084 (Dr. Cheponis), 3153 (Dr. Chandramouli).  On

examination, Dr. Stone noted Plaintiff had full upper and lower extremity strength, full

grip strength, and intact hand and finger dexterity.  Id. at 5385.  Thus, the ALJ's

consideration of Plaintiff's subjective complaints is supported by the medical record.

Plaintiff also takes issue with the ALJ relying on Plaintiff's daily activities in

discounting her allegations, arguing that "[a]n individual need not be in a vegetive state

to be found disabled."  Doc. 12 at 15 (citing Frankenfield v. Bowen, 861 F.2d 405, 408

(3d Cir. 1988)).  Defendant responds that "the ALJ permissibly considered Plaintiff's

daily activities as a single relevant consideration, among many, in evaluating [her]

subjective complaints."  Doc. 17 at 18 (citing 20 C.F.R. § 416.929(c)(3)(i).

The governing regulations require the ALJ to consider evidence regarding how

pain and other symptoms affect the claimant's activities of daily living.  20 C.F.R.

§ 416.929(a) & (c)(3); see also Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002)

(ALJ appropriately considered activities in evaluating subjective statements).  However,

"[d]isability does not mean that a claimant must vegetate in a dark room excluded from

all forms of human and social activity."  Smith v. Califano, 637 F.2d 968, 971 (3d Cir.

1981); see also Turby v. Barnhart, 54 F. App'x 118, 121 n.1 (3d Cir. 2002) ("Although certainly '[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity,' it is nonetheless appropriate for the ALJ to consider the 'number and types of activities' in which the claimant engages.") (quoting Smith, 637 F.2d at 971; Burns, 312 F.3d at 130-31). In addition, "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity." Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir. 2001) (citing Jesurum v. Sec'y U.S. Dept. of Health & Hum. Srvs., 48 F.3d 114, 119 (3d Cir. 1995)).

Here, the ALJ found that Plaintiff's "reports of daily activities are inconsistent with the pain alleged," and noted that Plaintiff "was able to drive, unpack boxes and shovel snow." Tr. at 26; see also id. at 314 (Plaintiff's Function Report indicating she can drive); 322 (Husband's Third Party Function Report), 3182 (Plaintiff reported to neurologist that she had been shoveling snow). By itself, without further explanation why Plaintiff's daily activities were inconsistent with the pain she alleged, this conclusion seems to veer into improper reliance on sporadic and transitory activity. However, any error is harmless in light of the significant treatment evidence previously discussed which supports the ALJ's assessment of Plaintiff's complaints. See Snyder v. Colvin, Civ. No. 16-261, 2017 WL 1732031, at *6 (M.D. Pa. May 3, 2017) ("[W]hether the error is harmless depends on whether the other reasons cited by the ALJ . . . provide substantial evidence for her decision.") (quoting Brumbaugh v. Colvin, Civ. No. 14-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014)), R&R adopted, 2017 WL 2798320, at *1 (M.D. Pa. June 28, 2017). The question is whether the ALJ's determination is

supported by substantial evidence. Plaintiff's daily activities were only one of several bases for the ALJ's determination regarding Plaintiff's subjective complaints. In the decision, the ALJ clearly focused on the treatment notes, Plaintiff's response to treatment, and the medical opinions in determining that Plaintiff's complaints were inconsistent with the record evidence, as previously discussed. See Vargas v. Saul, Civ. No. 18-2936, 2020 WL 3287032, at *4 (E.D. Pa. June 18, 2020) (finding no error when "the ALJ did not hold Plaintiff's daily activities up as the sole evidence in discounting his subjective statements[, but rather] considered them in conjunction with other evidence tending to show that [the claimant] was not as functionally limited as he contended"); see also Wisner v. Colvin, Civ. No. 23-356, 2024 WL 5167721, at *1 n.3 (W.D. Pa. Dec. 19, 2024) (substantial evidence supported assessment of subjective complaints even if activities relied upon were sporadic or transitory where activities of daily living was only one of several factors considered).

## IV.   **CONCLUSION**

The ALJ properly evaluated the opinion evidence, evidence regarding Plaintiff's headaches, and her mental health impairments. The physical and mental RFC assessments, and the ALJ's conclusion that Plaintiff's subjective complaints were not consistent with the record, are supported by substantial evidence.

An appropriate Order follows.